Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEYS FOR APPELLANT:

**DONALD WRAY**
**GLENN BOWMAN**
**NICHOLAS GAHL**
Stewart & Irwin, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GEORGE PLEWS**
**KAREN SCHEIDLER**
Plews Shadley Racher & Braun LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| FILMCRAFT LABORATORIES, INC. | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1107-CT-676 |
| | ) | |
| 5200 KEYSTONE LIMITED REALTY, LLC, | ) | |
| | ) | |
| Appellee. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Michael Keele, Judge
Cause No. 49D07-0310-CT-003394

June 18, 2012

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**DARDEN, Judge**

Appellant (defendant below) Filmcraft Laboratories, Inc. ("Filmcraft") files this interlocutory appeal from the trial court's order granting summary judgment to Appellee (plaintiff below) 5200 Keystone Limited Realty, LLC ("KLR") on its claim against Filmcraft and denying a cross-motion for summary judgment motion filed by Filmcraft against KLR.

We affirm in part, reverse in part, and remand.

## ISSUE

Whether the trial court erred by granting KLR's motion for summary judgment against Filmcraft.

## FACTS

This interlocutory appeal stems from continuing litigation involving real property—located at 5216 North Keystone Avenue in Marion County ("the Site")—that was tested in 2003 and determined to contain environmental contaminants but apparently has not had any remediation conducted. There are multiple parties that remain in this litigation; however, this interlocutory appeal involves only two parties: Filmcraft and KLR.

The designated evidence contained in the most recent summary judgment motions filed by KLR and Filmcraft reveals the following.[1] The Site contains a 10,000 square foot building. From 1956 to 1973, the Site was owned by A.C. Demaree, which operated a dry cleaning facility. From 1973 to 1981, Robert Dellen owned the Site. From 1974 to

---

[1] This is the second time KLR and Filmcraft have filed summary judgment motions against each other. The order from the first summary judgment motions between the parties was not appealed, but the facts relating to it will be discussed in the procedural history below.

1981, Filmcraft leased space at the Site from Dellen. Filmcraft's business included photography and photographic film development. Eric J. Spicklemire ("Spicklemire") and his father, John Spicklemire, operated and were shareholders and officers in Filmcraft. Later, upon his father's death in 1994, Spicklemire became president of Filmcraft.

In 1981, Spicklemire and his father purchased the Site from Dellen.[2] From 1981 to 2001, Filmcraft leased space at the Site from Spicklemire. While Spicklemire owned the Site, he also leased space at the Site to various tenants, including Clean Car, Inc. and The Wax Museum & Auto Sales, Inc., which operated car detailing businesses.

On May 26, 2000, Spicklemire obtained a loan from Apex Mortgage Corp. ("Apex"), a subsidiary of Firstrust Bank. Spicklemire and Apex entered into a promissory note, apparently giving Apex a mortgage or security interest in the Site.[3] That same day, Filmcraft signed a "Continuing Guaranty" on behalf of Spicklemire. (App. 11).[4] In the Continuing Guaranty, Filmcraft—as guarantor—"unconditionally guarantee[d] and promise[d] to pay" Apex—as lender—"the monies due under the Promissory Note of Borrower [Spicklemire]" and "any and all indebtedness" of Spicklemire to Apex.[5] (App. 11).

---

[2] At that time, Dellen held the property under the name Dellen Realty, Inc.

[3] Neither KLR nor Filmcraft included the promissory note in its designated evidence.

[4] Both Appellant Filmcraft and Appellee KLR filed an Appendix. We will refer to Filmcraft's Appendix as "App." and KLR's Appendix as "KLR's App."

[5] Spicklemire, in his capacity as President of Filmcraft, signed the Continuing Guaranty on behalf of Filmcraft. Joanna H. Spicklemire, who was secretary of Filmcraft, also signed the Continuing Guaranty as a guarantor. She is not a party in the underlying lawsuit.

In July 2001, Filmcraft closed its operations and vacated its space at the Site. Thereafter, Spicklemire defaulted on his loan with Apex, and in September 2001, Apex filed a foreclosure action on the Site.[6] The trial court issued a foreclosure judgment decree in April 2002. Following a sheriff's sale in September 2002, Apex obtained title, via the sheriff's deed, to the Site.

In 2003, Apex hired an agency to conduct environmental testing of the soil and groundwater at the Site and discovered that the Site contained environmental contaminants, including chlorinated solvents and petroleum hydrocarbons. In October 2003, Apex filed suit against Filmcraft, seeking contribution from Filmcraft for future environmental cleanup costs and alleging that Filmcraft was responsible for these cleanup costs under: (1) Indiana's Environmental Legal Action ("ELA") statute, Indiana Code section 13-30-9-2,[7] because Filmcraft had contributed to the release of hazardous substances at the Site; and (2) Indiana Code section 13-30-3-13(d)[8] ("the illegal dumping

---

[6] The record on appeal contains very limited information regarding the foreclosure action filed by Apex against Spicklemire because the parties did not include the foreclosure complaint or any documents relating to the foreclosure action in their designated evidence on summary judgment.

[7] Indiana Code section 13-30-9-2 provides:

> A person may, regardless of whether the person caused or contributed to the release of a hazardous substance or petroleum into the surface or subsurface soil or groundwater that poses a risk to human health and the environment, bring an environmental legal action against a person that caused or contributed to the release to recover reasonable costs of a removal or remedial action involving the hazardous substances or petroleum.

[8] Indiana Code section 13-30-3-13(d) provides:

> A landowner on whose land garbage or other solid waste has been illegally dumped without the landowner's consent may, in addition to any other legal or equitable remedy available to the landowner, recover from the person responsible for the illegal dumping:

4

statute")[9] because Filmcraft had illegally dumped garbage and solid waste at the Site.

In August 2004, Filmcraft filed a motion for summary judgment against Apex, arguing that it was not liable under either the ELA statute or the illegal dumping statute. Around that same time in August 2004, the Marion County Auditor gave Apex a notice of delinquent taxes. On October 7, 2004, the Site was sold at a tax sale.[10] On December 7, 2004, Apex quitclaimed by deed and sold the Site to KLR.[11] Thereafter, KLR was substituted as the plaintiff in the lawsuit against Filmcraft. In January 2005, KLR filed a cross-motion for summary judgment against Filmcraft, arguing that Filmcraft was liable for environmental cleanup costs under the ELA statute and the illegal dumping statute.

---

(1) reasonable expenses incurred by the landowner in disposing of the garbage or other solid waste; and

(2) reasonable attorney's fees.

[9] Indiana Code section 13-30-3-13(d) has also been referred to as the landowner recovery statute.

[10] The record on appeal does not reflect who purchased the Site at the tax sale.

[11] On December 12, 2004, five days after Apex quitclaimed by deed the Site to KLR, Apex and KLR executed a Real Estate Purchase Agreement. This Purchase Agreement provides that:

Buyer [KLR] shall be responsible for all real estate taxes . . . due and payable prior to, as of and after the Effective Date [December 12, 2004], including without limitation any and all taxes, special or other assessments, county costs, statutory redemption amounts, administrative fees, and expenses for, relating to or associated with the [Site], including without limitation any amounts related to or arising from the October 7, 2004 tax sale or subsequent rights of redemption and any monies required in connection therewith . . . .

(App. 328). The Purchase Agreement also indicates that Seller Apex provided Buyer KLR with various documents, including: the 2003 chemical investigation report for the Site; the complaint Apex filed against Filmcraft; a "Notice of Violation, dated September 24, 2004, from the City of Indianapolis to Apex Mortgage Corporation, related to the [Site];" and a "Notice of delinquent taxes, dated August 24, 2004, from the Auditor of Marion County to Apex Mortgage Corporation, together with all documents and other information associated therewith[.]" While referred to in the Purchase Agreement, neither the September 2004 notice of violation nor the August 2004 notice of delinquent taxes were included in the designated evidence.

5

In March 2005 and May 2005, KLR amended its complaint to add various other defendants who previously owned the Site, including Spicklemire, Russ Dellen, Inc., and A.C. Demaree, as well as defendants who had previously leased space at the Site, including Clean Car, Inc., The Wax Museum & Auto Sales, Inc., and Portrait America, Inc.[12]  In its last amended complaint, KLR sought contribution from all defendants for future environmental testing and subsequent remediation costs, and KLR also asserted a claim in which it sought to recover unpaid back property taxes from Spicklemire pursuant to Indiana Code section 6-1.1-22-13.[13]  No counterclaims or cross-claims were filed by any of the defendants.

At some point in 2005, KLR alleged that it had paid $25,000 to $30,000 in back property taxes on the Site.  The designated evidence does not indicate which tax years were paid by KLR.[14]  On May 10, 2005, Apex assigned KLR its rights to the Continuing Guaranty signed by Filmcraft on behalf of Spicklemire.

On May 24, 2005, KLR filed a second motion for summary judgment, this time against both Filmcraft and Spicklemire.  In regard to defendant Spicklemire, KLR argued that Spicklemire was responsible for future cleanup costs under the ELA statute, Indiana Code section 13-30-9-2, because as the former landowner and landlord of tenants, his

---

[12] Portrait America, Inc. was owned and operated by Spicklemire.

[13] KLR's complaint indicates that it sought "the 2002 taxes payable in 2003" owed by Spicklemire, which "were not due when Apex took title in December of 2002" but "remain a lien on the property." (App. 203).

[14] The only designated evidence regarding the payment of back taxes was an affidavit from a "member" of KLR, who swore under oath that "[KLR has] paid back real estate taxes on [the Site] in the amount of $25,000 to $30,000[;]" that "[KLR] paid these back taxes in 2005[;]" and that "[t]hese were real estate taxes owed by Eric J. Spicklemire." (App. 515).

acts or omissions caused or contributed to the release of hazardous materials at the Site.[15] In regard to Filmcraft, KLR argued that Filmcraft was responsible for payment of Spicklemire's environmental liability to KLR pursuant to the Continuing Guaranty that Filmcraft signed when Spicklemire mortgaged the property to Apex in 2000.[16]

On June 16, 2005, the trial court issued its order on the first motion for summary judgment that was pending between Filmcraft and KLR. In that order, the trial court granted summary judgment to Filmcraft on KLR's claim of illegal dumping but determined that there were genuine issues of material fact regarding KLR's claim that Filmcraft was liable under the ELA statute, and it denied the parties' cross-motions for summary judgment on that claim. Neither party appealed the trial court's summary judgment order.

In August 2005, the parties filed a joint motion to stay briefing on KLR's second motion for summary judgment, which the trial court granted. Thereafter, for approximately the next five years, little to no action occurred between the parties in this case, until the parties filed a joint motion to lift the stay previously granted by the trial court.[17]

---

[15] KLR also argued that it was entitled to summary judgment against Spicklemire under the illegal dumping statute but later dropped this argument from it summary judgment claims.

[16] KLR did not make any argument in its summary judgment motion regarding its claim for back property taxes.

[17] The only action that occurred during the pending five years was the trial court's grant of KLR's motions to enter default judgment against A.C. Demaree; Clean Car, Inc.; and The Wax Museum and Auto Sales, Inc. in August 2008.

Thereafter, in August 2010, both Filmcraft and Spicklemire filed individual cross-motions for summary judgment against KLR. Filmcraft argued that it was entitled to summary judgment against KLR, arguing that the Continuing Guaranty encompassed only financial liability, not environmental liability. In Spicklemire's cross-motion for summary judgment against KLR, he argued that he was not liable under the ELA statute, nor was he liable to KLR for unpaid property taxes under Indiana Code section 6-1.1-22-13 because KLR was not a taxing unit.

In September 2010, KLR filed a reply in support of its summary judgment motion against Filmcraft and Spicklemire. In its reply, KLR argued that, pursuant to either unjust enrichment or pursuant to the rights it acquired when it purchased the Site from Apex, it was entitled to summary judgment against Spicklemire for the payment of back property taxes that were owed by Spicklemire but paid by KLR. KLR also argued it was entitled to summary judgment against Filmcraft because, under the Continuing Guaranty, Filmcraft would be responsible for KLR's payment of Spicklemire's unpaid property taxes.

On April 13, 2011, the trial court held a summary judgment hearing.[18] On May 31, 2011, the trial court issued an order in which it granted KLR's summary judgment motion against Filmcraft; denied Filmcraft's cross-motion for summary judgment against

---

[18] The summary judgment proceedings were stayed one additional time prior to the summary judgment hearing. In September 2010, the trial court granted KLR's motion to vacate the scheduled summary judgment hearing and KLR's request to stay any decision on the pending summary judgment motions until the Court of Appeals issued an opinion in an appeal that involved the interpretation of the ELA statute and whether a landlord could be liable under the ELA statute. The appeal that was before the Court of Appeals was *Neal v. Cure*, 49A04-0908-CV-468, and this court issued an opinion in that case on November 24, 2010. *See Neal v. Cure*, 937 N.E.2d 1227 (Ind. Ct. App. 2010), *trans. denied*.

8

KLR; granted KLR's summary judgment motion against Spicklemire; and denied Spicklemire's cross-motion for summary judgment against KLR. Specifically, the trial court determined that: (1) Spicklemire is liable to KLR for environmental cleanup costs pursuant to the ELA statute; (2) Spicklemire is liable to KLR for back property taxes; and (3) Filmcraft is responsible for Spicklemire's environmental and tax liabilities, "if any," under the terms of the Continuing Guaranty. (App. 9).[19]

Thereafter, Filmcraft sought to have the trial court certify the summary judgment order for an interlocutory appeal, which the trial court granted. Filmcraft then filed a motion to accept jurisdiction of an interlocutory appeal with this court. This court granted Filmcraft's motion for interlocutory appeal, and Filmcraft timely filed a notice of appeal. Filmcraft now appeals the trial court's grant of KLR's motion for summary judgment against Filmcraft.[20]

---

[19] We note that the trial court's order is limited only to a determination that Spicklemire and Filmcraft have potential environmental and tax liability. According to the record before us on appeal, there appear to be many issues yet to be determined by trial court, including, but not limited to, the cost of environmental cleanup, the exact amount of property tax liability, the nature and amount of the hazardous substances released at the Site, and the extent of each party's potential contribution to the release of hazardous substances.

[20] Following Filmcraft's filing of its Appellant's Brief, co-defendant Spicklemire filed an appellate brief, titled "Brief of Appellee/Cross-Appellant," in which he argued—as an Appellee—that the trial court properly granted KLR's motion for summary judgment against Filmcraft and argued—as a Cross-Appellant—that the trial court erred by granting Appellee KLR's motion for summary judgment against him. Spicklemire also filed a Cross-Appellant Reply Brief. Filmcraft and KLR filed individual motions to strike Spicklemire's Brief and Appendix, and KLR has filed a motion to strike Spicklemire's Reply Brief. By separate order, we grant Filmcraft's and KLR's motions to strike Spicklemire's brief and appendix and grant KLR's motion to strike Spicklemire's reply brief. Thus, this interlocutory appeal involves review of the trial court's order only as it pertains to KLR's motion for summary judgment against Filmcraft. We will not address issues that relate to KLR's motion for summary judgment against Spicklemire that he may later raise on appeal.

DECISION

Filmcraft argues that the trial court erred by granting summary judgment in favor of KLR on its claim that Filmcraft was responsible, under the terms of the Continuing Guaranty, for Spicklemire's environmental and back property tax liabilities. Filmcraft contends that it is entitled to summary judgment on this claim. Resolution of this interlocutory appeal requires us to interpret the Continuing Guaranty signed by Filmcraft on behalf of Spicklemire when he obtained a loan from Apex Mortgage.[21]

The standard of review of a summary judgment is the same as that used in the trial court. *Kopczynski v. Barger*, 887 N.E.2d 928, 930 (Ind. 2008). Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.*; Ind. Trial Rule 56(C). We consider only the evidence designated to the trial court, and all facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant. *Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.*, 756 N.E.2d 970, 973 (Ind. 2001). The fact that the parties filed

---

[21] KLR argues that Filmcraft has waived its appellate arguments relating to the Continuing Guaranty because Filmcraft has cited cases not cited in its summary judgment motions and has made arguments on appeal that are more specific than it made on summary judgment. We cannot agree that this issue is waived. Indeed, our supreme court has noted:

> The rule that parties will be held to trial court theories by the appellate tribunal does not mean that no new position may be taken, or that new arguments may not be adduced; all it means is that substantive questions independent in character and not within the issues or not presented to the trial court shall not be first made on appeal. Questions within the issues and before the trial court are before the appellate court, and new arguments and authorities may with strict propriety be brought forward.

*Wagner v. Yates*, 912 N.E.2d 805, 811 n.1 (Ind. 2009) (quoting *Dedelow v. Pucalik*, 801 N.E.2d 178, 183–84 (Ind. Ct. App. 2003)). Because the issue of whether the Continuing Guaranty encompassed environmental liabilities was presented at the trial court level on summary judgment, we will review it on appeal.

cross-motions for summary judgment does not alter our standard of review. *Pond v. McNellis*, 845 N.E.2d 1043, 1053 (Ind. Ct. App. 2006), *trans. denied*. Construction of a written contract, such as the Continuing Guaranty disputed in this interlocutory appeal, is generally a question of law and is, therefore, particularly suited for resolution on summary judgment. *TW Gen. Contracting Servs., Inc. v. First Farmers*, 904 N.E.2d 1285, 1287-88 (Ind. Ct. App. 2009), *reh'g denied*; *Noble Roman's Inc. v. Ward*, 760 N.E.2d 1132, 1137 (Ind. Ct. App. 2002).

"A guaranty is a conditional promise to answer for a debt or default of another person." *TW General*, 904 N.E.2d at 1288. Three parties are required to execute a guaranty agreement: (1) an obligor or principal debtor—in this case, Spicklemire; (2) an obligee or creditor—in this case, Apex Mortgage; and (3) a guarantor or surety—in this case, Filmcraft. *See S–Mart, Inc. v. Sweetwater Coffee Co.*, 744 N.E.2d 580, 585 (Ind. Ct. App. 2001), *trans. denied.* A guaranty "is an agreement collateral to the debt itself and represents a conditional promise whereby the guarantor promises to pay only if the principal debtor fails." *Id.* (internal quotation marks and citation omitted). A continuing guaranty is defined as a guaranty that:

> contemplates a future course of dealing encompassing a series of transactions. . . . [A] contract is continuing if it contemplates a future course of dealing during an indefinite period, or if it is intended to cover a series of transactions or succession of credits, or if its purpose is to give to the principal debtor a standing credit to be used by him from time to time. A continuing guaranty covers all transactions, including those arising in the future, which are within the contemplation of the agreement.

*Id.* (citation and quotations omitted).

11

The rules governing the interpretation of contracts generally apply to the interpretation of a guaranty agreement. *Id.* "Generally, the nature and extent of a guarantor's liability depends upon the terms of his contract, and a guarantor cannot be made liable beyond the terms of the guaranty." *Noble Roman's*, 760 N.E.2d at 1138. "The terms of a guaranty should neither be so narrowly interpreted as to frustrate the obvious intent of the parties, nor so loosely interpreted as to relieve the guarantor of a liability fairly within its terms." *S–Mart*, 744 N.E.2d at 585-86. Our court has also explained that a guaranty "should receive a liberal interpretation, which means that words should not be forced out of their natural meaning, but that they should receive a fair and reasonable interpretation so as to attain the objects for which the instrument is designed and the purposes to which it is applied." *Orange-Co., Inc. v. Brown*, 181 Ind. App. 536, 539, 393 N.E.2d 192, 195 (1979) (citations omitted). "[A] guarantor is a favorite in the law and is not bound beyond the strict terms of the guaranty." *Paul v. Home Bank SB*, 953 N.E.2d 497, 503 (Ind. Ct. App. 2011). When construing a guaranty, this court must "give effect to the intentions of the parties, which are to be ascertained from the language of the contract in light of the surrounding circumstances." *Noble Roman's*, 760 N.E.2d at 1138. "Moreover, a guaranty of a particular debt does not extend to other indebtedness not within the manifest intention of the parties." *S-Mart*, 744 N.E.2d at 586 (citation omitted).

A. Environmental Liability

In its summary judgment motion, KLR argued that Filmcraft's responsibility for Spicklemire's environmental liability stemmed from the following provision within the Continuing Guaranty:

(1) For valuable consideration and intending to be legally bound, the undersigned [Filmcraft] (hereinafter called "Guarantors" whether there be more or one), unconditionally guarantees and promises to pay to APEX MORTGAGE CORP. a subsidiary of Firstrust Bank (hereinafter called "Lender"), on order or demand, in lawful money of the United States, the monies due under the Promissory Note of Borrower of even date herewith and any and all indebtedness of ERIC J. SPICKLEMIRE (hereinafter called "Borrower") to Lender. The word "indebtedness" is used herein in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of Borrower heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether direct or acquired by Lender by assignment or succession whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and whether Borrower may be liable individually or jointly with others, or whether recovery upon such indebtedness may be or hereafter becomes otherwise unenforceable.

(App. 11). When entering its summary judgment order, the trial court concluded the following as to KLR's claim against Filmcraft:

1. The language of the Continuing Guaranty is broad and unambiguous. Filmcraft is responsible for payment of Spicklemire's indebtedness including "liability of Borrower [Spicklemire] heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary and however arising[.]"

2. Under the unambiguous terms of the Continuing Guaranty, Filmcraft is responsible for payment of all Spicklemire's liabilities, including but not limited to Spicklemire's environmental liabilities and back tax liabilities.

3. KLR is entitled to summary judgment on its Continuing Guaranty claim against Filmcraft. Filmcraft's cross-motion is denied.

13

(App. 8).

On appeal, Filmcraft argues that the trial court erred by concluding that the Continuing Guaranty encompassed Spicklemire's environmental liability. Filmcraft does not argue that the language of the Continuing Guaranty is ambiguous. Filmcraft contends that a guaranty, by definition, does not relate to environmental liabilities and instead encompasses financial obligations relating to the lending of money. Filmcraft also points out that the Continuing Guaranty contains no mention of environmental liabilities. Filmcraft asserts that a review of the language of the Continuing Guaranty, as a whole, reveals that the intent of the parties was for the Continuing Guaranty to encompass the customary purpose of providing a guaranty for financial transactions and the lending of money, not a guaranty of environmental liabilities. In support of its argument that the "theme of this Continuing Guaranty [was] to relate to Filmcraft's promise to answer for Mr. Spicklemire's monetary debt" and not environmental liabilities, Filmcraft's Br. at 15, Filmcraft specifically points to the financial-related language contained throughout the Continuing Guaranty (such as "promise[] to pay . . . monies due[,]" "advances," "debts," "obligations," "liquidated or unliquidated," and the allowance of the lender to "increase or decrease the rate of interest" on the indebtedness) and points out the complete lack of any reference to terms that would denote an intent to cover environmental liabilities (such as "claims," "demands," or "causes of action"). Filmcraft's Br. at 15, 22.

KLR, on the other hand, argues that the trial court correctly determined that the Continuing Guaranty covered Spicklemire's environmental liability because the designated evidence showed that "[a]t the time Spicklemire signed the Guaranty on

14

behalf of Filmcraft, he knew that the Site had environmental impacts[.]" KLR Br. at 14. KLR contends that this knowledge suggests that Spicklemire intended that the Continuing Guaranty would include any liability that flowed from those environmental impacts.

In regard to KLR's argument regarding Spicklemire's awareness of environmental impacts, Filmcraft contends that "[e]nvironmental liabilities were not known at the signing of the Continuing Guaranty and had not been the subject of any prior agreement between the parties." Filmcraft Reply Br. at 8. The designated evidence includes Spicklemire's deposition testimony, which reveals that Spicklemire had been told by a realtor when he tried to sell the Site in 1996 that the Site might be hard to sell because of the dry cleaners that had previously occupied the Site.

Even if Spicklemire had knowledge that environmental contaminants from the dry cleaners were present at the Site at the time Filmcraft signed the Continuing Guaranty in 2000, this would not automatically lead to a conclusion that Filmcraft was responsible to KLR for Spicklemire's environmental liabilities. Under the Continuing Guaranty, Filmcraft promised to guaranty Spicklemire's indebtedness to Apex Mortgage, KLR's predecessor-in-interest. To the extent that Spicklemire had any knowledge of any environmental contaminants on the Site from the dry cleaners (or even if he had any potential contribution of contaminants through his operation of Filmcraft or through his role as landlord to tenants operating on the Site[22]), any potential resulting environmental liability—at least at the time the Continuing Guaranty was signed—would not have

---

[22] We make no determination on these issues, as they remain triable issues.

constituted an indebtedness or would not have been owed to Apex because it did not own the Site. There is no designated evidence showing that Spicklemire, at the time Filmcraft signed the Continuing Guaranty, had planned to default on the loan or had planned to allow Apex to foreclose on the Site and obtain title and ownership of it. Thus, any argument regarding Spicklemire's alleged knowledge of environmental contaminants on the Site at the time of the Continuing Guaranty does not support the trial court's determination that the parties intended for the Continuing Guaranty to encompass any and all of Spicklemire's environmental liability.

KLR also argues that Filmcraft is liable for Spicklemire's environmental liability because of the "expansive" language used in the Continuing Guaranty, and KLR cites to *TW General* in support of its argument.

In *TW General*, this court reviewed whether two guarantors, who had signed guaranties on behalf of a borrower on the borrower's initial loans from the lender, were liable to lender for additional loans the lender later made to the borrower.[23] In that case, the guarantors argued that they were not liable for the post-guaranty loans because these later loans did not reference the guaranties. The language of the guaranties at issue provided that guaranties were an "absolute, unconditional and continuing guaranty of payment of the Indebtedness" of the borrower to lender. *TW General*, 904 N.E.2d at 1289. The guaranties also provided that the guarantors were entering into the guaranties to "induce" the lender "at any time or from time to time to make loans" to the borrower and that the guarantors guaranteed to the lender, the payment of "each and every debt,

---

[23] The later loans included the renewal of one of the initial notes and two separate notes.

16

liability and obligation of every type and description [that] Borrower may now or any time hereinafter owe to Lender[.]" *Id.* at 1288. After reviewing the language of the entire guaranty, this court held that the guarantors had "entered into unmistakable, very expansive guaranties to 'induce' the Lender to make loans to [the borrower]" and that the plain language of the guaranties, which this court described as containing "clear, extremely global language[,]" made the guarantors responsible for the additional loans that the lender made to the borrower. *Id.* at 1290.

Unlike in *TW General*, here, we are not called upon to determine whether a guarantor is liable under the terms of a guaranty to a lender for an additional loan or later monetary debt that a borrower owes to a lender. Instead, we are called upon to determine whether Filmcraft (as guarantor) is liable under the terms of the Continuing Guaranty to KLR (as successor-in-interest to lender Apex Mortgage) for the potential environmental liabilities of Spicklemire (the borrower) for the time that he was owner and landlord of the Site where environmental contaminants have been discovered.

As we interpret the Continuing Guaranty at issue, we recall that we must "give effect to the intentions of the parties," which we will ascertain from the language of the guaranty "in light of the surrounding circumstances." *Noble Roman's*, 760 N.E.2d at 1138. Here, the designated evidence reveals that Filmcraft signed the Continuing Guaranty on May 26, 2000, when Spicklemire obtained a loan from Apex Mortgage. Under the Continuing Guaranty, Filmcraft agreed, as guarantor, to pay Apex, as lender, "the monies due under the Promissory Note of Borrower [Spicklemire]" and "any and all indebtedness" of Spicklemire to Apex. (App. 11).

17

We agree that the trial court's determination that the first paragraph of the Continuing Guaranty contains "broad" language, (*see* App. 8), including such terms as "comprehensive", "any and all", and "however arising[.]" (App. 11). Nonetheless, we cannot rely on this broad language in isolation without referring to the surrounding language in the paragraph and the remaining language of the Continuing Guaranty when determining the nature and extent of Filmcraft's liability as guarantor. *See Noble Roman's*, 760 N.E.2d at 1138 (explaining that the nature and extent of a guarantor's liability depends upon the terms of his contract and that a guarantor cannot be made liable beyond the terms of the guaranty). Indeed, the language surrounding those broad terms of that first paragraph are financial-related terms. Furthermore, the Continuing Guaranty explains that "[t]his is a continuing guaranty relating to indebtedness, including that arising under successive transactions which shall either continue the indebtedness or from time to time renew it after it has been satisfied." (App. 11). Additionally, as pointed out by Filmcraft, the other paragraphs in the Continuing Guaranty contain language of a financial nature (such as accelerating, extending, and changing the time for payment; changing the terms of the indebtedness; having the indebtedness paid in full).

Reviewing the Continuing Guaranty, as a whole, and the language and terms contained therein, we cannot agree with the trial court's determination that the intent of the parties was for Filmcraft to guarantee Apex's loan to Spicklemire plus any environmental liabilities that Spicklemire would later potentially owe to Apex once Apex obtained ownership of the Site. Instead, the language of the Continuing Guaranty reveals that the intent of the parties was that Filmcraft was guaranteeing payment of Apex's loan

18

to Spicklemire and any future loan that Apex would possibly make to Spicklemire. Indeed, "a guaranty of a particular debt does not extend to other indebtedness not within the manifest intention of the parties." *S-Mart*, 744 N.E.2d at 586 (citation omitted). Because a guarantor cannot be made liable beyond the terms of the guaranty, *see Noble Roman's*, 760 N.E.2d at 1138, we conclude that the trial court erred by determining that Filmcraft was liable under the Continuing Guaranty for any environmental liabilities that Spicklemire would potentially owe to Apex or KLR.[24] *See Orange-Co.*, 393 N.E.2d at 542 (holding that while the language of the lease and guaranty at issue revealed that the guarantor had guaranteed the lessee's rental payments under a lease to the lessor, the guarantor's guarantee could not be extended to a subsequent mortgage and note between the lessee and lessor where there was no evidence that the intent of the parties was for the scope of the guaranty to include the mortgage and note). Accordingly, we reverse the trial court's grant of summary judgment to KLR and remand for the trial court to grant summary judgment to Filmcraft on this issue.[25]

---

[24] Although Filmcraft is not liable under the Continuing Guaranty for Spicklemire's potential environmental liability under the ELA, there is—as explained by the trial court's order on Filmcraft's and KLR's first round of summary judgment motions—a genuine issue of material fact regarding Filmcraft's own environmental liability under the ELA.

[25] Filmcraft also argued, in the alternative, that Spicklemire did not have any environmental liability under the ELA; however, Filmcraft acknowledged that this court need not review such arguments if it were to determine that the Continuing Guaranty did not encompass Spicklemire's environmental liability. Because we hold that the Continuing Guaranty did not encompass Spicklemire's environmental liability, we will not review Filmcraft's alternative arguments.

Again, we emphasize that this interlocutory appeal involves only the summary judgment issue between Filmcraft and KLR of whether the Continuing Guaranty encompassed Spicklemire's potential environmental and property tax liability. Spicklemire's environmental liability under the ELA, as owner and landlord of the Site, remains a triable issue and will not be reviewed by this court.

19

B. Property Tax Liability

Filmcraft also argues that the trial court erred by concluding that the Continuing Guaranty encompassed Spicklemire's property tax liability.[26]   In regard to KLR's property tax claim, the trial court entered the following findings and conclusions relating to those taxes:

**FINDINGS OF FACT**

* * * * *

16.   On September 30, 2002 KLR's predecessor-in-interest, Apex Mortgage, came into possession of the Site as a result of a foreclosure action against Spicklemire[,] which culminated in the issuance of a Sheriff's Deed to Apex Mortgage.[]

17.  On May 26, 2000 Filmcraft signed a Continuing Guaranty in which it pledged to guarantee the liabilities of Spicklemire.[]   On May 10, 2005, KLR was assigned all rights under this Continuing Guaranty.[]

---

[26] KLR contends that Filmcraft has waived this issue on appeal because it did not make the same argument to the trial court.  Filmcraft acknowledges that it did not brief the property tax liability issue in its summary judgment response or cross-motion for summary judgment but contends that the issue is not waived because KLR included a property tax claim in its summary judgment motion, KLR had an opportunity to litigate it, and the trial court addressed the property tax issue in its summary judgment order.

For procedural clarity, we note that KLR did not make any argument in its initial summary judgment motion regarding back property taxes; it neither argued that Spicklemire was liable for back property taxes nor that Filmcraft was responsible for Spicklemire's tax liability pursuant to the Continuing Guaranty.  Instead, KLR included these claims against Spicklemire and Filmcraft in its reply in support of its summary judgment motion against the two defendants.  While we do not have the transcript from the summary judgment hearing, it seems apparent that KLR argued during the summary judgment hearing that it was entitled to summary judgment against Filmcraft because, under the Continuing Guaranty, Filmcraft would be responsible for KLR's payment of Spicklemire's unpaid property taxes.  Indeed, the trial court granted summary judgment to KLR on such claim.  Because the issue was raised before the trial court, we will review it on appeal.  *See Wagner*, 912 N.E.2d at 811-12 (finding that an issue was not waived on appeal where the issue was raised in a summary judgment response and where the trial court granted summary judgment on the issue).

We specifically note, however, that our review of the property tax issue is limited to whether Filmcraft is liable under the Continuing Guaranty for any potential amount that Spicklemire may owe to KLR for KLR's payment of property taxes on the Site.  We will not review the summary judgment issue between Spicklemire and KLR of whether Spicklemire is liable to KLR for the payment of back property taxes.

20

18.  KLR paid back taxes on the Site in the amount of $25,000 to $30,000. . . . These back taxes were paid in 2005.

## CONCLUSIONS OF LAW

\* \* \* \* \*

C. **The Taxes**

1.  In 2005, KLR paid real estate taxes owed by Spicklemire in order to release a tax lien on the Site.  KLR seeks to recover its payment from Spicklemire and Filmcraft through the Continuing Guaranty.

2.  KLR's right to recover also arises from the rights it acquired when it acquired the Site -- the quitclaim deed.  The Sheriff's Deed transferred all rights, including the right to back taxes, to Apex Mortgage.  On December 12, 2002, [sic[27]] Apex Mortgage transferred the Site and the rights to back taxes to KLR by a Quitclaim Deed.  There is nothing in those documents that limits KLR's rights as against Spicklemire.

## SUMMARY JUDGMENT ORDER

. . . Spicklemire is liable to KLR for the back taxes KLR paid.  Filmcraft is liable for Spicklemire's liabilities, if any, under the terms of the Continuing Guaranty.

(App. 4-5, 9) (footnotes omitted).[28]

Filmcraft acknowledges that back property taxes are "more financial in nature than environmental liabilities" but contends that Filmcraft should not be responsible for any of

---

[27] Apex quitclaimed the Site by deed in 2004.

[28] We note that while the trial court determined that Spicklemire was liable for back property taxes, the trial court's order was nonspecific and did not make a determination of the time period that Spicklemire was liable for back taxes or the exact amount that Spicklemire owed.  From the evidence before us, it appears that such a determination cannot be made at this point as the only designated evidence regarding the payment of Spicklemire's back property taxes was in the form of an affidavit from an officer of KLR, who generally stated that KLR paid between $25,000 to $30,000 in back taxes in 2005.  We reiterate that our review of the trial court's order is limited to whether Filmcraft is liable under the Continuing Guaranty for Spicklemire's potential back property tax liability.  We will not review the trial court's determination regarding Spicklemire's back tax liability and the amount, if any, that Spicklemire might owe for back taxes.

21

Spicklemire's potential property tax liability because such tax liability was beyond the intent and scope of the Continuing Guaranty. Filmcraft's Br. at 25.

On the other hand, KLR contends that tax liabilities are "well known to guarantors generally and to this particular borrower and guarantor" and that the Continuing Guaranty should not be construed to exclude such well known possible liability. KLR's Br. at 14.

As we construe the Continuing Guaranty, we are mindful that "[t]he terms of a guaranty should neither be so narrowly interpreted as to frustrate the obvious intent of the parties, nor so loosely interpreted as to relieve the guarantor of a liability fairly within its terms." *S–Mart*, 744 N.E.2d at 585-86. Indeed, we must "give effect to the intentions of the parties," which we will ascertain from the language of the guaranty "in light of the surrounding circumstances." *Noble Roman's*, 760 N.E.2d at 1138.

When considering the language of the Continuing Guaranty in light of the surrounding circumstances, we agree with the trial court's determination that Filmcraft would have potential liability under the Continuing Guaranty for Spicklemire's back property tax liability. However, as the trial court has yet to determine Spicklmire's exact property tax liability, we caution that Filmcraft's liability under the Continuing Guaranty would be limited to the amount of property taxes owed by Spicklemire during the time period that Spicklemire owned the Site.

The designated evidence reveals that Filmcraft signed the Continuing Guaranty in May 2000 when Spicklemire obtained a loan from Apex. The plain language of the Continuing Guaranty reveals that Filmcraft agreed to guarantee the promissory note on that loan as well as "any and all indebtedness" of Spicklemire to Apex. (App. 11).

22

Neither party provided a copy of the promissory note in their designated evidence, but they do not dispute the existence of the promissory note nor that the payment of property taxes goes with the land. In a typical promissory note, failure to pay property taxes can become part of the indebtedness that a mortgagor owes to a mortgagee. Here, Spicklemire defaulted on its loan with Apex, and Apex, who had a mortgage or security interest in the Site, filed a foreclosure action and obtained a foreclosure judgment against Spicklemire in April 2002. Following a sheriff's sale in September 2002, Apex obtained a sheriff's deed and title to the Site. Once Apex obtained title to the Site under the sheriff's deed in September 2002, Spicklemire's rights were extinguished; thus, he no longer possessed any ownership interest in the Site and was no longer liable for future property taxes thereafter accruing on the Site.

Because the Continuing Guaranty generally covers Spicklemire's indebtedness to Apex and because Apex had a security interest in the Site, any potential liability that Spicklemire may owe for back property taxes on the Site—limited to the time period that Spicklemire was owner of the Site—is guaranteed by Filmcraft and covered within the scope of the Continuing Guaranty.[29] Accordingly, we affirm the trial court's grant of

---

[29] We pause to remember that this case is before us on an interlocutory appeal and that there are still issues remaining before the trial court relating to defendant Filmcraft and the other remaining defendants. Among those issues pending before the trial court will be for it to make a determination regarding the exact amount, if any, of Spicklemire's property tax liability. Thus, we note that once the trial court makes such a determination, our holding that Filmcraft is liable under the Continuing Guaranty for Spicklemire's potential back property tax liability does not equate to a holding that Filmcraft will pay such back taxes. As Filmcraft's liability stems from the Continuing Guaranty, it will only be required to pay any yet-to-be determined back tax liability if Spicklemire cannot. *See S–Mart*, 744 N.E.2d at 585 (explaining that a guaranty represents a conditional promise whereby the guarantor promises to pay only if the principal debtor fails to pay).

summary judgment to KLR on this issue of Filmcraft's liability under the Continuing Guaranty for Spicklemire's potential property tax liability.

Affirmed in part, reverse in part, and remanded.

BAKER, J., and BAILEY, J., concur.